# EXHIBIT A

# GS DATA AND TECHNOLOGY SUBSCRIPTION AGREEMENT

*Between*

**GLOBAL SCIENCE RESEARCH LTD**

*And*

**SCL ELECTIONS LIMITED**

## Contents

1.  Term and Access ........................................................................................................................... 1
2.  Fees ............................................................................................................................................... 1
3.  Standards ...................................................................................................................................... 2
4.  Licensee obligations ..................................................................................................................... 2
5.  Change Control .............................................................................................................................. 3
6.  GS Licence ..................................................................................................................................... 3
7.  Liability .......................................................................................................................................... 4
8.  Confidentiality ............................................................................................................................... 4
9.  Data protection ............................................................................................................................. 6
10. Termination ................................................................................................................................... 7
11. Anti-Bribery ................................................................................................................................... 8
12. Force majeure ............................................................................................................................... 9
13. Variation ........................................................................................................................................ 9
14. Waiver ........................................................................................................................................... 9
15. Severance ..................................................................................................................................... 9
16. Entire agreement .......................................................................................................................... 9
17. Assignment ................................................................................................................................... 9
18. No partnership or agency ............................................................................................................. 9
19. Rights of third parties ................................................................................................................. 10
20. Advice and counsel ..................................................................................................................... 10
21. Notices ........................................................................................................................................ 10
22. Dispute Resolution ..................................................................................................................... 10
23. Governing law ............................................................................................................................. 11

Schedule 1 .......................................................................................................................................... 13
Definitions and interpretations ........................................................................................................... 13

Schedule 2 .......................................................................................................................................... 15
Project and Specifications .................................................................................................................. 15

**DATED: 4 JUNE 2014**

**PARTIES**

(1)      **GLOBAL SCIENCE RESEARCH LTD** (Company Number: 060785) whose trading office is at MAGDALENE COLLEGE, CAMBRIDGE CB3 0AG, United Kingdom (**"GS"** or **"Licensor"**)

(2)      **SCL ELECTIONS LIMITED** (Company Number: 08256225) whose trading office is at 108 New Bond Street, London W1S 1EF, United Kingdom (**"SCL"** or **"Licensee"**).

**Preliminary**

This GS Profiled Data and GS Technology Subscription Agreement ("**Agreement**") is between Licensor (**GS**) and the Licensee (**SCL**) who wishes to use the licensed GS Technology and GS Profiled Data for use as an end user.  This Agreement covers GS Technology, GS Profiled Data and any related Software and Documentation.

1.   **Term and Access**

   1.1   GS grants SCL a subscription Licence to use GS Technology and access GS Profiled Data in the Territory subject to the terms, rights, restrictions and limitations contained in this Agreement.

   1.2   The subscription Licence will commence on the Commencement Date and continue until the earlier of (a) November 31, 2014 (the **Term**) or (b) such time as one party gives notice to the other in accordance with clause 10.

   1.3   A Project and Specification Schedule (Schedule 2) has been prepared by GS and SCL that identifies any specific outcomes from the GS Technology or GS Profiled Data (the **Deliverables**) and the Fees to be paid by SCL to GS.

   1.4   In addition to the GS Technology and GS Profiled Data, GS may carry out further duties or Services as agreed between the parties in writing from time to time.

   1.5   This Agreement will prevail over any inconsistent terms or conditions contained, or referred to in any other communications, pre-contractual representations, mistakes, correspondence, terms or material supplied by either party, or by third parties, or implied by law, trade custom, practice or course of dealing.

2.   **Fees**

   2.1   SCL will pay to GS the Fees in accordance with the relevant Project and Specification Schedule.

   2.2   The Fees will be payable within seven (07) Working Days of the date of invoice, to be invoiced by GS to SCL on a mutually agreed upon rolling basis throughout the course of the Term.

   2.3   VAT or any other sales taxes (if any) will be excluded from the Fees.

   2.4   All amounts due under this agreement will be paid by SCL to GS in full without any set-off, counterclaim, deduction or withholding (other than any deduction or withholding of tax as required by law).

   2.5   GS shall make available to SCL receipts of expenditures for review, inspection and final approval by SCL where such approval shall remain in the judgement of SCL.  GS shall also submit weekly invoices in advance of spending monies on online harvesting exercises.  For the avoidance of doubt, invoices shall contain

the receipts from online panels, online surveying utilities, online display networks or online recruitment sites, whichever the case may be, and the monetary amount listed on that receipt must match the monetary amount being requested by the GS invoice.

2.6     Unless otherwise approved by SCL, GS warrants that monies transferred to it shall only be used for the procurement or harvesting of samples from online panels, online surveying utilities, online display networks or online recruitment sites, whichever the case may be, to further develop, add to, refine and supplement GS psychometric scoring algorithms, databases and scores, and that no monies from SCL shall be spent by GS on salaries, consultant fees, personnel, office space, travel, promotions and advertising.

2.7     Where travel is required and necessary for the completion of the Project, GS must first seek advance written approval of such travel expenses from SCL.

2.8     Where there are reasonable costs that are not borne from data collection but are advantageous to the delivery of Project, such as IT security, GS must first seek advance written approval of such non-data expenses from SCL.

## 3.     Standards

3.1     GS will provide SCL use of the GS Technology and access to GS Profiled Data using a "Software-as-a-Service" model.

3.2     GS will reasonably endeavour to allocate sufficient resources, including qualified personnel, to carry out, manage and support the reliable functioning of the GS Technology, GS online social media databases and GS Profiled Data.

3.3     In the event that GS is unable to provide sufficient resources or personnel after reasonable efforts given the constraints set out in clause 2.6, SCL will support GS in procuring resources or personnel for GS to use as its own agents to temporarily carry out, manage and support the GS Technology, GS online social media databases and GS Profiled Data.  GS shall not refuse such assistance unless GS determines that such assistance risks exposing or harming GS's Intellectual Property Rights.

3.4     For the avoidance of doubt, GS is entitled to use, at its discretion, third party contractors, subcontractors, vendors, affiliates and third parties to assist it with delivering this Project and/or with carrying out, managing and supporting the GS Technology, GS's online social media database and GS Profiled Data.

## 4.     Licensee obligations

SCL will:

4.1     co-operate with GS in all matters relating to the Project;

4.2     provide such information relating to SCL as GS may request and SCL considers reasonably necessary, in order to deliver the Project and carry out, manage and support the reliable functioning of the GS Technology and GS Profiled Data, in a timely manner, and ensure that it is accurate in all material respects; and

4.3     not attempt to appropriate, assert claim to, restrict or encumber the rights held in, interfere with, deconstruct, discover, decompile, disassemble, reconstruct or otherwise reverse-engineer the GS Technology, GS Profiled Data or GS's algorithms, current or future datasets or databases harvested using the GS Technology, methods, formulae, compositions, designs, source code, underlying

ideas, file formats, programming interfaces, inventions and conceptions of inventions whether patentable or un-patentable.

## 5.   Change Control

5.1   An authorised representative of SCL and an authorised representative of GS will meet at least once every week, either in person or via a virtual platform, to discuss matters relating to the Project.  If either party wishes to change the scope of the Licence or execution of the Project, it will submit details of the requested change to the other in writing.

5.2   If either party requests a change to the scope of the Licence or execution of the Project, GS will, within a reasonable time (and in any event not more than five working days after receipt of SCL's request), provide a written estimate to SCL of:

5.2.1   the likely time required to implement the change;

5.2.2   any necessary variations to the Fees arising from the change; and

5.2.3   any other impact of the change on this agreement.

5.3   Unless both parties agree in writing to a proposed change, there will be no change to this Agreement.

5.4   If both parties agree in writing to a proposed change, the change will be made, only after agreement of the necessary variations to the Fees, the Project, the Licence and any other relevant terms of this Agreement to take account of the change that has been reached.  The agreement must be varied in accordance with clause 13.

## 6.   GS Licence

6.1   GS grants to SCL a non-transferrable, non-sublicenseable, non-assignable, non-exclusive and limited subscription licence ("Licence") to use GS's online data harvesting and psychological profiling technology ("GS Technology") and to access psychological scores created by GS's underlying harvested datasets and algorithms ("GS Profiled Data") to further enhance or augment its political modelling of the population in eleven states within the Territory unless a future superseding agreement can be reached.

6.2   Notwithstanding anything to the contrary contained herein, except for the limited license rights expressly provided herein, GS has and will retain all rights, title and interest (including, without limitation, all patent, copyright, trademark, rights in underlying databases, trade secret, know-how and other Intellectual Property Rights) in and to the GS Technology, GS Profiled Data, and all copies, modifications, constituent data components and derivative works thereof.  SCL acknowledges that it is obtaining only a limited license right to use the GS Technology and GS Profiled Data and that irrespective of any use of the words "purchase", "sale" or like terms hereunder no ownership rights are being conveyed to SCL under this Agreement or otherwise.

6.3   SCL shall not release, risk, deposit or otherwise make available any of GS's proprietary, sensitive or confidential information or data to the public or to SCL's clients, partners or affiliates, particularly if that information or data could be used to deconstruct, discover, decompile, disassemble, reconstruct or otherwise reverse-engineer the GS Technology, GS Profiled Data or GS's algorithms, current or future datasets or databases, methods, formulae, compositions, designs, source code, underlying ideas, file formats, programming interfaces,

inventions and conceptions of inventions whether patentable or un-patentable. SCL also shall not archive any of GS's Intellectual Property beyond the Term.

6.4     SCL shall keep all of GS's proprietary, sensitive or confidential information or data strictly confidential by using a reasonable degree of care, but not less than the degree of care used by it in safeguarding its own confidential information.

6.5     SCL acknowledges that any and all Intellectual Property Rights held or owned or otherwise controlled, utilised, developed, acquired, created or licensed by GS will continue to vest with GS. Nothing in this Agreement shall inhibit, limit or restrict GS's ability to exploit, assert, transfer or enforce any Intellectual Property Rights anywhere in the world.

6.6     Neither party will be entitled to use the other party's marks or logos (including in connection with any promotional or marketing material, or exercise any promotional or marketing rights) without, on each and every occasion, the other party's prior written approval.

6.7     Upon reasonable notice from GS, and in order to confirm or investigate compliance with the provisions of this Agreement, SCL shall provide access to, and the right to inspect, all records relating to the GS Technology, GS's social media database and GS Profiled Data, and access logs pertaining to any processing thereof. Unless otherwise agreed, any such inspection shall occur only at the business offices of SCL, during normal business hours, and shall be conducted by a mutually acceptable third-party inspector. The costs of any such inspection shall be paid by GS upon requesting such inspection unless a data default within the procedures and processes of SCL is discovered, in which case SCL will be obliged to reimburse the reasonable costs of GS and any relevant third parties.

## 7.     Liability

7.1     Nothing in this agreement will operate to exclude or limit either party's liability for death or personal injury caused by its negligence, for fraud or for any other liability which cannot be excluded or limited under applicable law.

7.2     GS will not in any circumstances have any liability for any loss or damage which may be suffered by SCL, whether suffered directly or indirectly, whether immediate or consequential and whether arising in contract, tort (including negligence) or otherwise, which falls within any of the following categories:

7.2.1     special or indirect or consequential damage even if GS was aware of the circumstances in which such damage could arise; or

7.2.2     loss of profits (whether considered a direct or indirect loss).

7.3     GS's aggregate liability in respect of claims arising out of or in connection with this agreement or any collateral contract, whether in contract or tort or otherwise, will not exceed the Contract Fee paid by SCL to GS under this Agreement.

7.4     All conditions, warranties or other terms which might have effect between the parties or be implied or incorporated into this agreement or any collateral contract, whether by statute, common law or otherwise, are, to the extent permitted by law, excluded.

## 8.     Confidentiality

8.1     Either party may disclose (**Disclosing Party**) confidential information to the other party (**Receiving Party**) in relation to other party's business, business practice,

employees or other confidential information relating to the other party's business affairs (**Confidential Information**).

8.2    For the avoidance of doubt, Confidential Information shall include, but not be limited to, Documentation or any information provided by GS to SCL pertaining to GS Technology and GS Profiled Data.

8.3    The Receiving Party will:

   8.3.1    not use such Confidential Information other than for the purpose of performing its obligations under this agreement; and

   8.3.2    not disclose such Confidential Information to a third party except with the prior written consent of the Disclosing Party or in accordance with clauses 8.4 and 8.5.

8.4    The Receiving Party may disclose Confidential Information to any of its directors, other officers, employees, agents, subcontractors and advisers (a **Recipient**) to the extent that disclosure is reasonably necessary for the purposes of this Agreement.

8.5    The Receiving Party will ensure that each Recipient is made aware of and complies with the Receiving Party's obligations of confidentiality under this agreement as if the Recipient were a party to this agreement.

8.6    The Receiving Party must not make any copies of Confidential Information without the express consent of the Disclosing Party and must maintain and protect the Confidential Information with the same degree of care as it uses to keep confidential its own proprietary information, but in any event with not less than a reasonable degree of care.

8.7    The provisions in this clause 8 do not apply to Confidential Information which:

   8.7.1    at the date of this agreement or at any time after that date, becomes publicly known, other than by the Receiving Party's or a Recipient's breach of this agreement.

8.8    The Receiving Party will at the Disclosing Party's request and also upon any termination of this agreement:

   8.8.1    return to the Disclosing Party all documents and other materials that contain any of the Confidential Information, including all copies made; and

   8.8.2    permanently delete all electronic copies of Confidential Information from the Receiving Party's computer systems except pursuant to legal, regulatory or professional standards requirements.

8.9    Following termination of this agreement:

   8.9.1    the Receiving Party will make no further use of the Confidential Information; and

   8.9.2    the Receiving Party's obligations under this agreement will otherwise continue in force in respect of Confidential Information, disclosed without limit in time.

8.10    Any disclosure of Confidential Information pursuant to this agreement will not confer on the Receiving Party any Intellectual Property Rights in relation to the Confidential Information.

8.11   To the extent that the Receiving Party may be required to disclose Confidential Information by order of a court or other public body that has jurisdiction over the Receiving Party, it may do so. Before making such a disclosure the Receiving Party will, if the circumstances permit, inform the Disclosing Party of the proposed disclosure as soon as possible (and if possible before the court or other public body orders the disclosure of the Confidential Information).

8.12   Neither party may make any public announcement or disclosure regarding the existence or subject matter of this Agreement, unless it first obtains the other party's written consent.

8.13   For the avoidance of doubt, the Receiving Party's duty of confidence shall apply to any related prior communication or provision of Confidential Information by the Disclosing Party to the Receiving Party that occurred prior to the Commencement Date of this Agreement.

## 9.   Data protection

9.1   The parties warrant and undertake to each other that, in relation to this agreement, they have complied with and will continue to comply with the provisions of all relevant personal information legislation, regulations and/or directives in all relevant territories, including, for the avoidance of doubt, the Data Protection Act 1998 and any safe harbour principles agreed between the United States Department of Commerce and the European Commission. Each of the parties warrants and undertakes that it will not knowingly do anything or permit anything to be done which might lead to a breach of any such legislation, regulations and/or directives by the other party.

9.2   GS warrants to SCL that the Terms and Conditions of the GS Technology and any other related data harvesting exercise it conducts shall seek out informed consent of the seed user engaging with the GS Technology and that GS shall materially and substantially conform its operations, procedures, databases and technologies to the eight Data Protection Principles as outlined in Schedule 1 of the Data Protection Act 1998.

9.3   Both parties to this Agreement assert and recognise that GS is the Data Controller per Section 1(1) of the Data Protection Act 1998 for any and all data harvested using the GS Technology or any GS online social media database and therefore GS shall be burdened with ensuring compliance with the Data Protection Act 1998 and the Information Commissioner's Office.

9.4   GS shall ensure it is duly registered with the Information Commissioner's Office and that it remains in good standing with all relevant administrative and regulatory bodies.

9.5   Upon reasonable notice from SCL, and in order to confirm or investigate compliance with the Data Protection Act 1998 and any safe harbour principles agreed between the United States Department of Commerce and the European Commission, GS shall provide access to, and the right to inspect, all SCL voter file records (SCL Data) transferred to GS for matching to GS online data or to be scored by the GS Technology, and access logs pertaining to any processing thereof. Unless otherwise agreed, any such inspection shall occur only at the business offices of GS, during normal business hours, and shall be conducted by a mutually acceptable third-party inspector. The costs of any such inspection shall be paid by SCL upon requesting such inspection unless a gross statutory compliance default within the procedures and processes of GS is discovered, in

which case GS will be obliged to reimburse the reasonable costs of SCL and any relevant third parties.

**10.  Termination**

10.1    Either party may terminate this agreement with immediate effect at any time by notice in writing to the other if:

10.1.1    the other is in material or persistent breach of any provision of this Agreement, and the breach, if capable of remedy, is not remedied within 20 Working Days of receipt by the defaulting party of notice requiring the breach to be remedied; or

10.1.2    the other party suffers an Insolvency Event.

10.2    SCL may terminate this agreement after the Trial Sample but before the full Project commences if:

10.2.1    the SCL voter file records transferred to GS, matched to GS online harvested data and scored by GS Technology do not meet minimum quality and coverage standards set forth in the Agreement as outlined in clause 10.3; and

10.2.2    reasonable written notice is delivered to GS.

10.3    SCL warrants that it will be satisfied that GS has delivered sufficient quality and coverage if the Trial Sample delivered to SCL:

10.3.1    contains a minimum of 10,000 uniquely matched records in one or more of the States as defined in Schedule 2 of this Agreement;

10.3.2    where no record contains fewer than 70% of the number of scores as agreed to in Schedule 2 of this Agreement; and

10.3.3    where a matched record is defined as an entry that can only be matched to a unique single record in the SCL dataset and where unique is defined as a combination of the record's forename, surname, gender and, if available, birthday and/or location.

10.4    Upon the completion of the Project, GS shall delete any data transferred by SCL to its servers, or in the event where SCL data has been transferred by GS onto third party cloud computing services, GS shall order that cloud server to delete the data. However, SCL data may be used for academic research where no financial gain is made, so long as permission is granted by SCL to GS at the end of the Project where permission will not be unreasonably withheld.  GS warrants to SCL that GS shall not commoditise any data transferred to GS by SCL unless SCL grants GS written permission to do so where permission shall be left at the sole and exclusive discretion of SCL.

10.5    In the event that GS is unable to provide SCL the minimum quality standards as stipulated in this Agreement, or where GS fails to deliver a minimum of two million (2,000,000) matches in the eleven States within the timeline outlined in Schedule 2 of this Agreement, then SCL shall not transfer to GS any of its data.

10.6    In the event that GS provides SCL with two million one hundred thousand matched records (=2,100,000) in the eleven States that also meet the minimum quality standards at an averaged cost of each matched record is at or below Fifty US Cents (USD \$0.50), then SCL will additionally transfer to GS a dataset of circa

one million (~ 1,000,000) citizens of Trinidad and Tobago for use in academic research.

10.7 For the avoidance of doubt, GS also warrants to SCL that GS shall further respect the terms of the "Master License and Services Agreement" between SCL and InfoGroup signed in March 2014 and not use the datasets for any financial gain. GS will also seek out written advance permission from Cambridge Analytica LLC, a Delaware limited liability company, where that data is to be published.

10.8 SCL shall retain ownership of its voter file datasets and nothing in this Agreement, including where SCL delivers to GS samples of voter data for matching to GS scores, shall be construed as a transfer of ownership from SCL to GS.  For the avoidance of doubt, any SCL data used by GS to match GS's harvested online data and scores to the SCL voter roll or to SCL consumer data must be separated from the GS database and deleted after the matching exercise is completed unless permission is granted by SCL in writing to GS to retain that data on the conditions set out in clause 10.4 of this Agreement.

10.9 Upon completion of the Project, GS shall waive any moral rights held in the matched voter file records or message testing results outlined in Schedule 2 of this Agreement to SCL and GS shall not object to SCL taking credit for the records without any reference to GS when making copies of the records, messages or scores to be delivered to clients.

10.10 On termination of this agreement (however arising) clauses 6, 8, 9, 10, 14, 15, 16, 19, 21 and 23 will survive and continue in full force and effect.

## 11. Anti-Bribery

11.1 Both parties will:

11.1.1 comply with all applicable laws, statutes, regulations relating to anti-bribery and anti-corruption including but not limited to the Bribery Act 2010 (**Relevant Requirements**);

11.1.2 not engage in any activity, practice or conduct which would constitute an offence under sections 1, 2 or 6 of the Bribery Act 2010 if such activity, practice or conduct had been carried out in the UK;

11.1.3 comply with SCL's anti-bribery policies that may update them from time to time (**Relevant Policies**); and

11.1.4 have and will maintain in place throughout the term of this agreement its own policies and procedures, including adequate procedures under the Bribery Act 2010, to ensure compliance with the Relevant Requirements, the Relevant Policies and clause 11.1.2, and will enforce them where appropriate.

11.2 GS must ensure that any person associated with GS who is performing services in connection with this agreement does so only on the basis of a written contract which imposes on and secures from such person terms equivalent to those imposed on GS in this clause 11 (**Relevant Terms**). GS will be responsible for the observance and performance by such persons of the Relevant Terms, and will be directly liable to SCL for any breach by such persons of any of the Relevant Terms.

11.3 For the purpose of this clause 11, the meaning of adequate procedures and whether a person is associated with another person will be determined in

accordance with section 7(2) of the Bribery Act 2010 (and any guidance issued under section 9 of that Act), sections 6(5) and 6(6) of that Act and section 8 of that Act respectively.

## 12. Force majeure

GS reserves the right to defer the date for performance or delivery of the GS Technology, GS Profiled Data or any additional Services if GS is prevented from, or delayed in, carrying on its business by acts, events, omissions or accidents beyond its reasonable control, including (without limitation) extremely low sample response rates out of GS's control given the temporal, financial or material constraints of this Project, strikes, lockouts or other industrial disputes (whether involving the workforce of GS or any other party), failure of a utility service or transport network, act of God, war, riot, civil commotion, malicious damage, accident, breakdown of plant or machinery, fire, flood, storm or default of suppliers or subcontractors.

## 13. Variation

No variation of this agreement will be valid unless it is in writing and signed by or on behalf of an authorised representative of each of the parties.

## 14. Waiver

14.1   A waiver of any right under this agreement is only effective if it is in writing.  No failure or delay by a party in exercising any right or remedy under this Agreement or by law will constitute a waiver of that (or any other) right or remedy, nor preclude or restrict its further exercise.  No single or partial exercise of such right or remedy will preclude or restrict the further exercise of that (or any other) right or remedy.

14.2   Unless specifically provided otherwise, rights arising under this agreement are cumulative and do not exclude rights provided by law.

## 15. Severance

15.1   If any provision of this agreement (or part of any provision) is found by any court or other authority of competent jurisdiction to be invalid, illegal or unenforceable, that provision or part provision will, to the extent required, be deemed not to form part of this agreement, and the validity and enforceability of the other provisions of this agreement will not be affected.

15.2   If a provision of this agreement (or part of any provision) is found illegal, invalid or unenforceable, the provision will apply with the minimum modification necessary to make it legal, valid and enforceable.

## 16. Entire agreement

16.1   This Agreement and all schedules appended thereto, constitutes the whole agreement between the parties and supersedes all previous agreements between the parties relating to its subject matter.

16.2   Nothing in this Agreement will limit or exclude any liability for negligence or fraud.

## 17. Assignment

SCL will not, without the prior written consent of GS, assign, transfer, charge, mortgage, or deal in any manner with all or any of its rights or obligations under this agreement.

**18.   No partnership or agency**

Nothing in this agreement is intended to, or shall be deemed to, constitute a partnership or joint venture of any kind between either of the parties, nor constitute either party the agent of the other party for any purpose.  Neither party shall have authority to act as agent for, or to bind, the other party in any way.

**19.   Rights of third parties**

A person who is not a party to this Agreement will not have any rights under or in connection with it.

**20.   Advice and counsel**

Both parties acknowledge and warrant to each other that they have read and fully understand the terms and provisions of this Agreement, have had an opportunity to edit, amend and negotiate the terms of this Agreement to reflect their wishes, have had an opportunity to review this Agreement with independent, qualified and competent legal counsel and with independent technical advice from subject matter experts, and have executed this Agreement based upon their own judgment and advice of independent counsel.

**21.   Notices**

21.1   Any notice or other communication given under this agreement must be in writing (which for the purposes of this clause 20 includes email) and delivered personally, sent by first class post, or transmitted by fax or email to the relevant party's address specified in this agreement or to such other address or fax number or email address as either party may have last notified to the other.  A confirmatory copy of any notice transmitted by fax or email must also be delivered or sent by first class post to the relevant party.

21.2   Any notice or other communication is deemed to have been duly given on the day it is delivered personally, or on the second Working Day following the date it was sent by post, or on the next Working Day following transmission by fax or email or, in the case of any notice or communication delivered by pre-paid airmail, providing proof of postage on the fifth Working Day following the due date it was sent by post.

**22.   Dispute Resolution**

22.1   If any dispute arises in connection with this agreement, the parties will first attempt to resolve it in good faith as promptly as practicable.  If such dispute cannot be resolved within 20 Working Days of notice of the dispute or within such further period as the parties may agree mutually, the parties will attempt to settle it by mediation in accordance with the London Court of International Arbitration (**LCIA**) under the LCIA Rules, which Rules are deemed to be incorporated by reference into this clause.

22.2   The number of arbitrators shall be one (01).

22.3   The seat, or legal place, of arbitration shall be London, UK.

22.4   The language to be used in the arbitral proceedings shall be English.

22.5   The governing law of the contract shall be the substantive law of England and Wales.

22.6   Each party shall bear its own costs in connection with any mediation and the parties shall bear equally the costs of such mediation.

**23.  Governing law**

23.1   This agreement, and any dispute or claim arising out of or in connection with it or its subject matter, will be governed by, and construed in accordance with, the law of England and Wales.

23.2   The parties irrevocably agree that the courts of England and Wales will have exclusive jurisdiction to settle any dispute or claim that arises out of, or in connection with, this agreement or its subject matter.

GS Data and Technology Subscription Agreement

The parties have signed this agreement on the date set out above.

**SIGNED** by
**DR ALEKSANDR KOGAN** for and on
behalf of GLOBAL SCIENCE RESEARCH
LTD in the presence of:

Witness:

Signature     :

Name     : Joseph Chancellor

Occupation     : Co-Director, GSR

Address     : 12 AINSWORTH PLACE CB2PL

**SIGNED** by _____
**ALEXANDER NIX** for and on behalf of SCL
Elections Limited in the presence of:

Witness:

Signature     :

Name     :

Occupation     :

Address     :

GS Data and Technology Subscription Agreement

The parties have signed this agreement on the date set out above.

**SIGNED** by _____
**DR ALEKSANDR KOGAN** for and on
behalf of GLOBAL SCIENCE RESEARCH
LTD in the presence of:

Witness:

Signature      :

Name           :

Occupation     :

Address        :

**SIGNED** by
**ALEXANDER NIX** for and on behalf of SCL
Elections Limited in the presence of:

Witness:

Signature      :

Name           : *MARCUS BELTRAN*

Occupation     : *SCL EMPLOYEE*

Address        : *108 NEW BOND STREET*
                 *London WIS IEF*

### Schedule 1
### Definitions and interpretations

1.    In this agreement, including the schedules, the following words and expressions have the following meanings:

| | |
|---|---|
| **Authorised Person** | to be appointed by each party. |
| **Commencement Date** | the date of this agreement. |
| **Deliverables** | the services to be delivered by GS to SCL in accordance with Schedule 2. |
| **Documentation** | means any supporting product help and/or technical specifications documentation provided by GS to SCL. |
| **Fees** | the fees payable in respect of the Licence and Project payable as referred to in and in accordance with the Project and Specification Schedule. |
| **Insolvency Event** | where the relevant party: |

    1.    has a receiver, administrative receiver, administrator, manager or official receiver appointed over its affairs;

    2.    goes into liquidation, unless for the purpose of a solvent reconstruction or amalgamation;

    3.    has distress, execution or sequestration levied or issued against any part of its assets and is not paid within seven days;

    4.    is otherwise unable to pay its debts as they fall due within the meaning of section 123 Insolvency Act 1986; or

    5.    is subject to any analogous event under the law of any relevant jurisdiction.

**Intellectual Property Rights**    all patents, rights to inventions, utility models, copyright and related rights, trade marks, service marks, trade, business and domain names, rights in trade dress or get-up, rights in goodwill or to sue for passing off, unfair competition rights, rights in designs, rights in computer software, database rights, rights in online data harvested by GS and in online social media data scored or collected by GS, topography rights, rights in confidential information (including know-how and trade secrets) and any other intellectual property rights, in each case whether registered or unregistered and including all applications for and renewals or extensions of such

|  | rights, and all similar or equivalent rights or forms of protection in any part of the world. |
| --- | --- |
| **Licence** | the licence agreement entered into between GS and SCL on the date of this Agreement as specified in clause 6. |
| **Personal Data** | as defined in the Data Protection Act 1998. |
| **Project** | the project set out in the Project and Specification Schedule. |
| **Services** | any services provided GS to SCL in addition to the Licence as set out in Schedule 2, as may be amended by the parties from time to time. |
| **Territory** | United States of America |
| **Working Day** | a day (other than a Saturday or Sunday) on which banks are open for domestic business in the City of London, UK. |

2. Schedule and paragraph headings will not affect the interpretation of these Conditions.

3. A **person** includes a natural person, corporate or unincorporated body (whether or not having separate legal personality).

4. The schedules form part of this agreement and will have effect as if set out in full in the body of this agreement and any reference to this agreement includes the schedules.

5. Words in the singular will include the plural and vice versa.

6. A reference to a statute or statutory provision is a reference to it as it is in force for the time being, taking account of any amendment, extension, or re-enactment and includes any subordinate legislation for the time being in force made under it.

7. Any obligation in this agreement on a person not to do something includes an obligation not to agree, allow, permit or acquiesce in that thing being done.

8. References to clauses and schedules are to the clauses of and schedules to this agreement.

9. Headings are for convenience only and are to be ignored in interpreting this agreement.

## Schedule 2
## Project and Specification Schedule

### Background and Rationale

To infer psychological profiles, self-report personality test data, political party preference and moral value data are collected as described below in "Process Overview". After data is collected, models are built using psychometric techniques (e.g. factor analysis, dimensional scaling, etc) which use Facebook likes to predict people's personality scores. These models are validity tested on users who were not part of the training sample. Trait predictions based on Facebook likes are at near test-retest levels and have been compared to the predictions their romantic partners, family members, and friends make about their traits. In all previous cases, the computer-generated scores performed the best. Thus, the computer-generated scores can be more accurate than even the knowledge of very close friends and family members.

GS's methodology is different from most social research measurement instruments in that it is not soley based on self-reported data. Using observed data from Facebook users' profiles makes GS's measurement genuinely behavioural. Interviews, surveys, and long lists of Likert scales rely on using a respondent's answers in a specific situation as a proxy for observational data generated over long periods of tracking individuals. These types of data collection are frequently met with problems of interviewer bias, noise generated by anomalies in verbal presentation of survey questions, confounding influence of participant's mood, and the difficulties in estimating long-term personality behaviour from short and volatile psychometric questionnaires, among others. Furthermore, these methods rely on people being willing to respond to surveys--thus, creating a sample that is biased towards more altruistic and compliant members of society. Since this option is not reliant on people answering surveys, this bias is completely avoided.

GS's method represents a scalable, digital solution to psychometric profiling that avoids these concerns. Using Facebook data as a repository of observed online behaviours enables the analysing and modelling of said data to create robust personality psychology profiles on a scale that reaches into the millions, compared to less than 100 profiles generated by the laboratory-based personality observation methods of the past over a period of months.  GS's methods also allow SCL to substantially gain value and benefit from insight derived from people who live outside the target eleven states, as their data is also used to create, refine and make more accurate human personality models that can then score those who live in the eleven target states.

The resulting deliverable is a less costly, more detailed, and more quickly collected psychological profile at the same or greater volume of individuals profiled than other options, like standard political polling or phone samples. GS's method relies on a pre-existing application functioning under Facebook's old terms of service. New applications are not able to access friend networks and no other psychometric profiling applications exist under the old Facebook terms.

### Geographic Scope ("States")

The GS Profiled Data will only be appended to voter file records (SCL Data) supplied to GS by SCL in the following eleven States in the Territory:

| | | | |
|---|---|---|---|
| 1. | Arkansas | 6. | Nevada |
| 2. | Colorado | 7. | New Hampshire |
| 3. | Florida | 8. | North Carolina |
| 4. | Iowa | 9. | Oregon |
| 5. | Louisiana | 10. | South Carolina |

11. West Virginia

**Phased Implementation**

There will be two phases in this project:

---

**Phase I: "Trial Sample Phase"**

This phase will be used by SCL to assess the GS Technology and GS Profiled Data.

This phase will begin on the Commencement Date and last for seven (07) Working Days from that date.

**Phase II: "Full Sample Phase"**

This phase will be used by SCL for message testing and to generate a "Super Sample" for its political modelling project in the aforementioned eleven (11) States in the Territory.

This phase will begin the day following the end of Phase I and last for 20 Working Days.

**Optional Timeline Extension**

If SCL determines, at its sole and exclusive discretion, that GS is making genuine and reasonable efforts to deliver the Project, but constraints outside GS's reasonable control are delaying progress, SCL may choose to grant GS up to an additional 10 Working Days to complete the deliverables of this Project whereby for the purposes of this Agreement GS will be considered to have delivered the Project on time.

---

**Minimum Data Contents for Matched Records**

All matched records supplied by GS to SCL must contain the following:

- Forename
- Surname
- Gender
- Location
- Modelled GS Big Five Personality Scores (x5)
- Modelled GS Republican Party Support Score
- Modelled GS Political Involvement/Enthusiasm Score
- Modelled GS Political Volatility Score

**Additional Data Contents for Matched Records**

SCL recognises that not all its records matched to GS Data will contain the same information and that coverage of different data points will vary within the GS Data in the eleven States. However, where a matched record in one of the eleven States contains the following data, GS will also provide:

- Date of Birth (Partial or Complete)
- Zip Code
- Residential Address (or any component thereof)
- Answers to political surveys, if they completed one

**Quantity of GS Scored Records Matched to SCL Voter Records (Trial Sample Phase)**

The total size of the initial Trial Sample will range between ten thousand (10,000) and thirty thousand (30,000) respondents in the Territory.

## Quantity of GS Scored Records Matched to SCL Voter Records (Full Sample Phase)

The total number of GS records matched to SCL records in the eleven States will range between one and a half million (1,500,000) and two million (2,000,000) and GS will make reasonable efforts to provide two million (2,000,000) matched records, or as close to that quantity as possible.

## Fees

**Contract Fee:** Three Pounds Fourteen Pence (GBP £3.14).

**Trial Sample Fee:** Fee shall not exceed Five US Dollars (USD $5.00) per successful Seed Respondent.

**Full Subscription Fee:** To be established after the Trial Sample and where the total Subscription Fee, when divided by scored records successfully matched to SCL's voter file and consumer database, shall not exceed the price of Seventy-Five US Cents (USD $0.75) per matched record.

## Process Overview

The approach has several steps:

1. GS generates an initial "seed sample" using online panels.
2. GS uses its battery of psychometric inventories to investigate psychological, dispositional and/or attitudinal facets of the sampled respondents.
3. GS guides respondents through its proprietary data harvesting technology (GS Technology) and upon consent of the respondent, the GS Technology scrapes and retains the respondent's Facebook profile and a quantity of data on that respondent's Facebook friends.
4. The psychometric data from the seed sample, as well as the Facebook profile and Facebook friend data is run through a proprietary set of algorithms that models and predicts psychological, dispositional and/or attitudinal facets of each Facebook record.
5. The output of step 4 is a series of scores for each record.
6. GS receives a dataset from SCL and conducts a matching exercise to append two million (2,000,000) records with GS scores.
7. GS exports the matched records back to SCL.

## Phase I Training Set

In order to effectively create psychological profiles based on relationships to Facebook data, a set of training data will be necessary. This data gathering will be composed of a full personality inventory and Facebook scrape for each individual included. Furthermore, procedures in the training set must meet the highest possible standards of normalised demographic distribution and satisfaction of statistical assumptions surrounding linear modelling analysis.

The ultimate product of the training set is creating a 'gold standard' of understanding personality from Facebook profile information, much like charting a course to sail. Once the procedure to produce personality profiles from Facebook data is finalised, some free radical factors will impact these predictions within a controlled error rate, just as a charted course to sail must be as perfect as possible account for multiple unknown tidal, meteorological, and geographic factors. Sampling in this phase will be repeated until assumptions and distributions are met.

## Assumptions of Linear Modelling

**Linearity:** Predictor variables must be correlated (related) to outcome variables in a linear fashion.

**Independence:** Residuals from terms of the regression must be independent (uncorrelated). We will use a Durbin-Watson test to produce independence test statistics.

**Homoscedasticity:** Each level of each predictor variable must be subjected to tests of variance and cross-compared. P-values produced from tests comparing variance results across predictor levels will determine violation or satisfaction of this assumption.

**Error distribution normality:** The residuals from the modelling procedure must be checked for normality. T-tests comparing means of the model and observed data must produce p-values that are insignificant.

**External variable independence:** All related data collected from individuals, which are not included in the models but are significantly correlated to outcome variables, must be uncorrelated to predictor variables.

## Message Testing

Throughout Phase II SCL's messaging concepts will be tested by appending message testing procedures to a subset of seed sample. This experimental design will be measured using a modified AD ACL neurological arousal measure to test emotional response to message stimuli. Testing in this manner will facilitate direct comparison of psychological profiles to message test outcomes for individuals matched to the SCL database as concurrent processes. This message testing procedure streamlines design by reducing call centre load and optimising cost through pre-matched online samples. For the avoidance of doubt, message testing shall occur concurrently to the Phase II Full Sample and political message testing shall be incorporated into the seed samples to reduce costs and optimise the timeline.

## Demographic Distribution Analysis

As matched psychological profiles from each cohort are received by SCL, frequency analysis on each of the aforementioned demographic variables will be conducted to unsure that the distribution of these variables matches the distribution of the complete voter database in each state. Should these skews be found, subsequent iterations will engage in targeted data collection procedures through multiple platforms to eliminate these biases, thus ensuring that psychological profiles cover all possible groups to emerge from target voter clustering. If necessary, brief phone scripts with single-trait questions will be conducted to polish off data gaps which cannot be filled in from targeted online samples.